**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Raymond Leslie PEDDLE, Deborah Ann Coates, Defendants-Appellants.**

**No. 86–3252.**

United States Court of Appeals, Eleventh Circuit.

July 20, 1987.

**1522**

H. Jay Stevens, Federal Public Defender, Theda R. James, Asst. Federal Public Defender, Tampa, Fla., for Peddle.

J. Stanford Lifsey, Tampa, Fla., for Coates.

Robert W. Merkle, U.S. Atty., Robert Kennedy, Asst. U.S. Atty., Tampa, Fla., Mervyn Hamburg, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before HILL and HATCHETT Circuit Judges, and HENDERSON, Senior Circuit Judge.

PER CURIAM:

Raymond Peddle and Deborah Coates were each charged in a four-count indictment in the United States District Court for the Middle District of Florida. The indictment charged conspiracy to import cocaine, conspiracy to possess cocaine with the intent to distribute, importation of cocaine, and possession of cocaine with the intent to distribute, in violation of 21 U.S.C. §§ 963, 846, 952, and 841(a)(1). Following a jury trial both defendants were adjudged guilty on all counts. Peddle was sentenced to concurrent terms of imprisonment for ten years and Coates received a concurrent sentence of three years. On appeal, Peddle and Coates argue that there was insufficient evidence to warrant a jury instruction on "conscious avoidance" and that there was insufficient evidence to support their convictions.

On December 10, 1985, United States customs officers boarded a yacht bearing the name CONSTELLATION, which had just arrived in Clearwater, Florida. This vessel had been under surveillance since the summer of 1985, based on a confidential informant's allegation that the vessel was carrying contraband. At the time the customs agents boarded the vessel there were four occupants, Peddle, who identified himself as the master, Coates, who stated that she served as the cook and as a member of the crew, and two other crew members, Cirilo Velazquez and Juan Campillo. In response to questions from Randy Davis, a customs officer, both Peddle and Coates denied that any contraband or narcotics were aboard, and neither was able to supply the name or address of anyone who was connected with the ownership of or who was responsible for the vessel.

The vessel was searched while the occupants remained aboard. The officers' inspection of the CONSTELLATION concentrated upon the aftermost area below deck where a false fuel tank was discovered on each side of the vessel situated behind an actual fuel tank. The false tanks were sawed open and found to be empty. Early the following morning the searching activities were adjourned. Peddle and Campillo left at that time to conduct business in Tampa. The search resumed at noon, at which time Officer Joseph Fariello donned scuba gear and went into the water to check the bottom of the vessel's hull. Be-

low the waterline on the vessel's stern he saw a compartment resembling an auxiliary tank attached to the port side and a similar compartment on the starboard side. Each compartment was encased in fiberglass. Officer Fariello reported his findings and the CONSTELLATION was towed to a dry dock so that the compartments could be examined more closely.

At the dry dock a four-inch hole was drilled into the starboard exterior compartment. Inside the compartment the officers found plastic and canvas bags. Some of the contents of one of the bags were removed and field tested. The test revealed that the substance was cocaine. In all, 300 kilograms of cocaine were removed from these compartments. Velazquez and Campillo, who had returned in the interim, were arrested at the site of the vessel.

While waiting at the marina for the results of the search of the outer compartments, Officer Davis had further conversations with Coates. She stated that during the journey from Cozumel the two Cuban crewmen, Campillo and Velazquez, had burned rubber in the engine room of the vessel and that the smell was so bad at times they had to sleep outdoors or open the doors of the vessel. At approximately 5:00 p.m. Peddle returned from Tampa and remained with Coates. Davis told him that the CONSTELLATION had been removed from the water and asked whether they could expect to discover drugs. Peddle replied, "I suspect, you know, there may be." (ROA, vol. 5, p. 23.) When notified by radio of the discovery of the cocaine in the compartments, Davis arrested Peddle and Coates.

That evening two agents of the Drug Enforcement Agency (DEA) drove the appellants from the Clearwater police department to the DEA office in Tampa. While in the car Peddle spoke to the officers. According to Peddle, he and Coates left Canada and sailed to the Bahamas during the summer of 1985 to escape the oncoming cold weather. While in the Bahamas they became acquainted with several Cuban men, who learned of Peddle's familiarity with navigation. Thereafter, the Cubans

offered to hire Peddle to sail a pleasure craft from Panama to the United States. Because he was running low on funds, Peddle accepted the offer. He and Coates sailed their own vessel from the Bahamas to Miami and left it there. They stayed in Miami approximately one month and then flew to Panama, where Peddle met more Cubans and was present when a large box, which he assumed contained money, was transferred from the Cubans to certain Colombians. Peddle and Coates boarded the CONSTELLATION in Colon, and at that time met Campillo and Velazquez. Peddle sailed the boat to Cozumel. The journey was slow and the vessel difficult to steer. They stopped at Cozumel for repairs and refueling. Following a brief stop at a nearby island, they proceeded to Clearwater.

The agents asked whether Peddle knew that there was cocaine aboard the vessel. Peddle denied such knowledge. He added, however, that certain circumstances made him suspicious that "something was going on with the vessel and that it might be carrying contraband of some kind." (ROA, vol. 5, p. 53.) Those circumstances included the events surrounding his discussions with the wealthy Cubans in the Bahamas, Miami and Panama, the difficulty in handling the vessel, and the demeanor of Campillo and Velazquez during the voyage. Peddle stated that although he suspected that something was amiss, "he really didn't even want to know what was onboard [sic]." (Id.)

As Peddle related his story to the agents during the trip to the DEA office, Coates said little but nodded her head in affirmance when Peddle mentioned meeting rich and powerful Cubans in the Bahamas and when Peddle stated that he was unaware that cocaine had been secreted on the boat. She expressed fear of the Cubans and agreed verbally when Peddle said that he did not want to know what was aboard the vessel.

During further questioning the defendants also stated that on numerous occasions during the trip to Clearwater Campillo and Velazquez had gone to the engine room and excluded the defendants from

that area. On these occasions, they could smell the odor of burning rubber emanating from the engine room. Asked by the agents if they had been threatened by the Cubans, Peddle and Coates remarked that they considered Campillo and Velazquez capable of committing acts of violence and that they were mindful of the horror stories told by the Cubans in the Bahamas about those who had cooperated with the police against drug smugglers and dealers.

After the CONSTELLATION was forfeited to the government, an attempt was made to remove the false fuel tanks from below deck, in preparation for selling the vessel. A welder hired to remove the tanks discovered a square pattern on the starboard interior wall that had been sealed with putty. Removing the cover, the welder found a hatch. A similar hatch was found on the port side. Each of the hatches led to the compartments that had been discovered earlier on the exterior undersides of the CONSTELLATION, thereby allowing access to those compartments from inside the vessel. The access covers inside the boat had been disguised and deliberately smudged to resemble the bilge of an engine room.

Peddle and Coates each took the stand in their own defense. Both claimed no knowledge of the cocaine before its discovery and no reason to suspect any illegal conduct from the nature of their employment or their itinerary. Over the defendants' objections the court instructed the jury that while knowledge was a necessary element of the crimes charged, an inference of such knowledge could be established by evidence of a conscious purpose to avoid enlightenment.[1] Both defendants were convicted on all counts.

The defendants first challenge the district court's instruction on conscious avoidance. Deliberate ignorance of criminal activity has been recognized by this circuit, and others, as the equivalent of knowledge, and on that basis, the "deliberate ignorance/conscious avoidance" charge has been accepted by these courts. *See United States v. Aleman,* 728 F.2d 492 (11th Cir. 1984); *United States v. Restrepo-Granda,* 575 F.2d 524 (5th Cir.1978); *United States v. Murrieta-Bejarano,* 552 F.2d 1323 (9th Cir.1977). In order for a conscious avoidance instruction to be proper, it must be based on facts which "point in the direction of deliberate ignorance." *United States v. Batencort,* 592 F.2d 916, 918 (5th Cir.1979), quoting *Murrietta-Bejarano,* 552 F.2d at 1325.

The record leaves no doubt that the conscious avoidance instruction was warranted in this case. In Peddle's case the circumstances surrounding his employment were highly suspicious, including evidence of talks with "rich and powerful" Cubans in the Bahamas, who spoke of the dangers of the drug trade; a month's stay in Miami, paid for by these Cubans; and the transfer of a box (presumably containing money) between the Cubans and certain Colombians. These facts are hardly consistent with Peddle's explanation that he was merely hired to navigate the boat from Panama to the United States and should certainly have put Peddle on notice of the irregular nature of this endeavor. Addi-

---

1. The charge read, in relevant part, as follows:

    Now, when knowledge of the existence of a particular fact is an essential part of an offense, such knowledge may be established if the defendant is aware of a high probability of its existence unless he actually believes that it does not exist. So, with respect to the issue of the defendant's knowledge in this case, if you find from all the evidence beyond a reasonable doubt that the defendant believed that the motor vessel 'CONSTELLATION' contained cocaine, a controlled substance, and deliberately and consciously tried to avoid learning that there was a cargo of cocaine onboard [sic] in order to be able to say if he should be apprehended that he did not know that there was, in fact, cocaine on the vessel, you may treat such deliberate avoidance of positive knowledge as the equivalent of knowledge. In other words, you may find that a defendant acted knowingly. If [sic] you find beyond a reasonable doubt either that the defendant actually knew that he possessed cocaine or that he deliberately closed his eyes to what he had every reason to believe was a fact.

    I must emphasize, however, that the requisite proof of knowledge on the part of a defendant cannot be established by merely demonstrating that he was negligent, careless or foolish.

tionally, as captain he noticed difficulty in steering the vessel and was aware of the peculiar behavior of his crew members, Velazquez and Campillo, who frequently burned rubber in an attempt to sully the appearance of the engine room for no apparent reason. Most important, however, Peddle informed the law enforcement officers that "he suspected something was going on with the vessel and that it may be carrying contraband of some kind ... [and] that while he didn't know for sure what was onboard [sic] but suspected something was he really didn't even want to know what was onboard [sic]." (ROA, vol. 5, p. 53.) On these facts it is clear that the conscious avoidance instruction was proper.

The majority of these factors also apply to Coates, although she was not an experienced sailor. She, too, benefited from the month-long stay in Miami and was aware of the nature of the people who had hired them and the unusual conduct of the crewmen. She also mentioned her suspicions to the officers and verbally agreed with Peddle's statement that he didn't even want to know what was on board the vessel. The conscious avoidance instruction was also applicable in her case.

■ The appellants also contend that there was insufficient evidence upon which to base their convictions and that the court therefore erred in denying their motion for judgment of acquittal. In determining whether there was sufficient evidence to support the conviction we must review all evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). While it is true that there is no direct evidence that the defendants were aware of the cocaine, there is certainly evidence, as recounted above, to indicate that they consciously avoided such knowledge. The standard to be applied in judging the sufficiency of the evidence is the same whether the evidence is direct or circumstantial. *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed.2d 150 (1954). The district court committed no error in denying the motions for judgment of acquittal.

For the foregoing reasons the judgments of conviction are

AFFIRMED.

HATCHETT, Circuit Judge, dissenting:

I dissent. The prosecution did not present sufficient evidence to convict Coates. Under the deliberate ignorance instruction, the prosecution had the burden of proving beyond a reasonable doubt that Coates "believed [s]he was importing a controlled substance and through willful blindness failed to confirm that belief." *United States v. Restrepo-Granda*, 575 F.2d 524, 529 (5th Cir.1978). The jury could not reasonably have found beyond a reasonable doubt that Coates believed the boat carried a controlled substance. The case against Coates amounts to this: She was present when some wealthy Cubans hired her husband to sail a boat from Panama to Florida; the Cubans paid for lodging in Miami for a month; the Cubans told stories indicating that persons who cooperate with law enforcement agencies are dealt with severely; Coates was aware that two crew members on the boat were burning rubber in the engine room of the vessel; Coates expressed fear of the Cubans; and she agreed with Peddle when he said he did not want to know what was aboard the vessel.

Peddle admitted that he only suspected that contraband might be aboard the vessel. This suspicion was based largely on the fact that the vessel was difficult to steer (due to the undiscovered auxiliary tanks) and the fact that he witnessed the transfer of a box, which he believed contained money, from the Cubans to several Colombians in Panama. Coates, on the other hand, did not witness the transfer of the box, and due to her lack of nautical knowledge, was unaware of the difficulty in steering the vessel. Moreover, Coates accompanied Peddle on his stem to stern inspection of the vessel prior to the voyage. Nothing in that investigation raised their suspicions.

Perhaps the best evidence that Coates had no belief that the vessel contained a controlled substance, is the fact that the Drug Enforcement Agency officers

searched the vessel for 10 to 12 hours without finding the controlled substances. This fact creates a strong inference that no visible evidence indicated to Coates the nature of the vessel's cargo. The jury's verdict against Coates on all four counts is not supported by substantial evidence.