[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11333

_____

D.C. Docket No. 6:18-cr-00124-RBD-GJK-5

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

NADINE BROMFIELD ALEXANDER,
SHAMEER HASSAN,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(May 27, 2021)

Before JORDAN, NEWSOM, and TJOFLAT, Circuit Judges.

PER CURIAM:

Based on their suspected involvement in a fraudulent sweepstakes scheme, a

grand jury indicted Nadine Alexander and Shameer Hassan on a number of federal

charges. After a trial—at which several co-conspirators testified for the government—a jury found Ms. Alexander and Mr. Hassan guilty of (a) conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1349 and 1343; (b) conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(1)(B)(i); and (c) aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1) and (b). The jury also found Mr. Hassan guilty of concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

Ms. Alexander and Mr. Hassan appeal, raising a number of arguments. Following a review of the record, and with the benefit of oral argument, we affirm.[1]

**I**

Both Ms. Alexander and Mr. Hassan challenge the sufficiency of the evidence. We review those claims *de novo*, "resolving all reasonable inferences in favor of the verdict." *United States v. Yost*, 479 F.3d 815, 818 (11th Cir. 2007). "The evidence does not have to exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Hernandez*, 433 F.3d 1328, 1333-34 (11th Cir. 2005) (quotation marks and citation omitted). "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could

---

[1] Because we write for the parties, we assume their familiarity with the record, and set out only what is necessary to explain our decision.

have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 1335 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

**A**

To prove a conspiracy to commit wire fraud under 18 U.S.C. § 1349, the government must prove beyond a reasonable doubt "(1) that a conspiracy [to commit wire fraud] existed; (2) that the defendant knew of it; and (3) that the defendant, with knowledge, voluntarily joined it." *United States v. Vernon*, 723 F.3d 1234, 1273 (11th Cir. 2013) (quotation marks and citation omitted). To prove a conspiracy to commit money laundering under 18 U.S.C. § 1956(h), the government must prove an "(1) agreement between two or more persons to commit a money-laundering offense; and (2) knowing and voluntary participation in that agreement by the defendant." *United States v. Broughton*, 689 F.3d 1260, 1280 (11th Cir. 2012).

To prove the offense of concealment money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), the government must demonstrate that "(1) the defendant conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of a statutorily specified unlawful activity; (3) the defendant knew the proceeds were from some form of illegal activity; and (4) the defendant knew a purpose of the transaction was to conceal or disguise the nature, location, source, ownership, or control of the proceeds." *United States v. Miles,* 290 F.3d 1341, 1355 (11th Cir. 2002).

3

To establish aggravated identity theft under 18 U.S.C. § 1028A(a)(1), the government must prove that "during (or in relation to) the commission of those other crimes [listed in the statute], the offender '*knowingly* transfers, possesses, or uses, without lawful authority, *a means of identification of another person.*'" *Flores-Figueroa v. United States*, 556 U.S. 646, 647 (2009) (quoting 18 U.S.C. § 1028A(a)(1)).

**B**

The charged fraud conspiracy involved a fraudulent sweepstakes scheme which lasted from February of 2012 to October of 2014. The scheme was operated by co-conspirators in Jamaica. The Jamaica-based members of the scheme would call victims in the United States—many of whom were elderly or disabled—and tell them they had won a sweepstakes prize and that to collect their winnings they needed to wire the taxes and fees to co-conspirators in Orlando, who posed as either employees of the sweepstakes company or government officials. Once the funds were received in Orlando, other co-conspirators would wire the money back to Jamaica, and that aspect of the scheme formed the basis for the money laundering charges. The scheme resulted in victims losing millions of dollars.

According to Ms. Alexander, the government presented insufficient evidence to support her conspiracy convictions. She maintains that the evidence sufficed only as to her conviction for aggravated identity theft.

4

Ms. Alexander worked at Mega Nursing, where she had access to personally identifiable information ("PII"), and multiple co-conspirators testified at trial that she provided PII to her boyfriend, an unindicted co-conspirator. Ms. Alexander argues that because there is no evidence demonstrating how much money, if any, she received from the scheme, and because the government conceded at trial that she never personally called any victims or tried to convince anyone to take part in the scheme, she was not aware of the full scope of the conspiracy.

We disagree. The evidence presented at trial was sufficient to sustain Ms. Alexander's convictions on both conspiracy counts. Even without direct proof that she was aware of the full scope or details of the conspiracy, the evidence presented by the government established that she played a key role in the scheme by stealing customers' identities through her work at Mega Nursing, applying for debit cards used to receive the victims' money, and wiring fraud proceeds to co-conspirators in Jamaica. Given this evidence, a rational jury could reasonably infer that Ms. Alexander understood the nature of the full sweepstakes conspiracy, including the movement of the money back to Jamaica. *See United States v. Reeves*, 742 F.3d 487, 497 (11th Cir. 2014) ("It is by now axiomatic that [p]articipation in a criminal conspiracy need not be proved by direct evidence; a common purpose or plan may be inferred from a development and collocation of circumstances.") (quotations and citation omitted).

For his part, Mr. Hassan argues that there was insufficient evidence to support his conspiracy convictions as well as his convictions for concealment money laundering and aggravated identity theft. Mr. Hassan, who was an agent for Jamaica National (a money transfer company), regularly wired money for the co-conspirators through the Jamaica National terminal—and, later, the Western Union terminal—located in his restaurant. He frequently used stolen identities obtained from Ms. Alexander and other co-conspirators to send the wire transfers, rather than using his or his co-conspirators' real names.

Mr. Hassan contends that the evidence at most establishes only that he violated Jamaica National's policies when he sent wire transfers in the names of others. Like Ms. Alexander, he also asserts that the evidence at trial did not show that he knew about the scheme or that he knew he was wiring the proceeds of a fraud scheme.

The evidence presented at trial was sufficient to sustain Mr. Hassan's convictions on all charges. For example, the evidence demonstrated not only that Mr. Hassan played an integral role in the conspiracy by wiring millions of dollars—the fraud proceeds—through the Jamaica National and Western Union terminals in his restaurant, but also that he often used customers' identities without their knowledge, wired money without a sender present, and forged signatures when wiring money in other people's names. Moreover, the government presented

6

evidence that Mr. Hassan regularly received training and warnings from Jamaica National specifically related to lottery and money-laundering scams in Jamaica. Despite this information from Jamaica National, Mr. Hassan continued to wire millions of dollars for his co-conspirators using false sender information and forged signatures. Finally, the government presented evidence that Mr. Hassan received 10 percent of all the wires he sent for the co-conspirators.

Mr. Hassan's argument that the evidence did not support his money laundering and aggravated identity theft convictions—because the government failed to prove that he knew that the funds he was transferring had resulted specifically from wire fraud—also fails. The money laundering statute requires only that Mr. Hassan knew that the money represented "the proceeds of some form of unlawful activity," not necessarily that the funds were wire-fraud proceeds from a specific unlawful scheme. *See* 18 U.S.C. § 1956(a)(1). And as discussed above, there was sufficient evidence to support the jury's finding that Mr. Hassan knew of the fraud conspiracy and joined it.

Given this evidence, a rational jury could have reasonably found that Mr. Hassan was guilty of the conspiracy, concealment money laundering, and aggravated identity theft charges. *See Hernandez*, 433 F.3d at 1335.

## II

Mr. Hassan argues that the district court erred by instructing the jury that he could be found guilty if it determined beyond a reasonable doubt that he "actually knew that the funds involved in the financial transactions were the proceeds of unlawful activity, or had every reason to know but deliberately closed his eyes." Reviewing for abuse of discretion, *see United States v. Tokars*, 95 F.3d 1520, 1541 (11th Cir. 1996), we find no reversible error.

"[A] district court should not instruct the jury on 'deliberate ignorance' when the relevant evidence points only to actual knowledge, rather than deliberate avoidance." *United States v. Rivera*, 944 F.2d 1563, 1571 (11th Cir. 1991) (citations omitted). But a deliberate ignorance instruction is appropriate in cases where, as here, evidence shows that a defendant "was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." *United States v. Schlei*, 122 F.3d 944, 973 (11th Cir. 1997).

Two co-conspirators testified at trial that though they never told Mr. Hassan that the money he was wiring was from the proceeds of fraud, they all agreed that he would not ask questions about where the money was from. Although the government primarily advanced a theory of actual knowledge, this evidence supported the district court's deliberate ignorance instruction. Furthermore, Mr.

Hassan used stolen identities as the names of the senders, rather than using his name or the co-conspirators' names, and this evidence permitted the jury to reasonably find that Mr. Hassan either actually knew the money was from unlawful activity or deliberately avoided learning that fact. Thus, the district court did not err when it gave the deliberate ignorance instruction. *See United States v. Alvarez*, 837 F.2d 1024, 1028 (11th Cir. 1988).[2]

### III

With regard to aggravated identity theft, the district court instructed the jury that "[t]he Government must prove that the Defendant knowingly transferred, possessed, or used another person's identity 'without lawful authority.' The Government does not have to prove that the Defendant stole the means of identification. The Government is required to prove the Defendant transferred, possessed, or used the other person's means of identification for an unlawful or illegitimate purpose." According to Mr. Hassan, the use of the word "illegitimate" would allow the jury to find him guilty based on an ethical or technical violation rather than a finding that he used another's identity "without lawful authority."

---

[2] We do not address whether the district court erred when it modified the pattern jury instruction to include an example of deliberate ignorance in the context of a money-laundering crime, rather than the drug-trafficking example that is included in the pattern. Because Mr. Hassan raises this argument in one sentence of his brief without citing to any legal authority or explaining why the modification was error, this argument is deemed abandoned. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012); *In re Globe Mfg. Corp.*, 567 F.3d 1291, 1297 n.3 (11th Cir. 2009).

We disagree.  One way of proving that a defendant used another's means of identification "without lawful authority" is by showing that, even if he initially obtained or took the means of identification with permission, he used it "illegitimately—in excess of the authority granted." *United States v. Reynolds*, 710 F.3d 434, 436 (D.C. Cir. 2013).  The aggravated identity theft instruction here explained to the jury that, although Mr. Hassan may have initially obtained the identifying information lawfully (i.e., by operating the Jamaica National terminal), use of that information in excess of the authority granted would be illegitimate and thus without lawful authority (e.g., when he used prior customers' information to send the co-conspirators' money to Jamaica without the customers' knowledge).

But even accepting Mr. Hassan's contention that the word "illegitimate" also could be read to include ethical or technical violations, the district court did not expand liability for aggravated identity theft to include mere violations of Jamaica National's policies and procedures.  Instead, the district court properly instructed the jury on the third element of that crime—that, to convict Mr. Hassan, the government had to show that he transferred, possessed, or used another person's means of identification "during and in relation to a felony violation of 18 U.S.C. § 1349."  Accordingly, the district court did not abuse its discretion.

10

IV

Ms. Alexander argues that the district court mistakenly attributed the entire $3.6 million in losses to her given the limited role she played in the fraudulent sweepstakes scheme. In her view, "the evidence at best establishes that [she] supplied [her boyfriend] with some Live Scan forms used in the conspiracy, amounting to a total loss of $287,465." Ms. Alexander's Brief at 22. Ms. Alexander contends that under our decision in *United States v. Hunter*, 323 F.3d 1314 (11th Cir. 2003), the district court erred because it failed to make a particularized finding about the scope of her agreement to participate in the scheme.

We review *de novo* the district court's interpretation and application of the Sentencing Guidelines, but a loss calculation is reviewed for clear error. *See United States v. Pierre*, 825 F.3d 1183, 1198 (11th Cir. 2016). In *Hunter*, we held that "the fact that the defendant knows about the larger operation, and has agreed to perform a particular act, does not amount to acquiescence in the acts of the criminal enterprise as a whole." *Hunter*, 323 F.3d at 1320. Relying on this language, Ms. Alexander argues that the district court erred by failing to make any particularized findings about the scope of the criminal activity that she agreed to undertake. Instead, the district court held her accountable for the full loss amount by reasoning that "the fact that [she] stole these identifications and provided them to the members of the

conspiracy makes her role vital to the . . . successful operation of the conspiracy." Ms. Alexander's Brief at 23.

For offenses involving fraud or deceit, the Sentencing Guidelines instruct a sentencing court to increase the defendant's offense level based on "the greater of the actual loss or the intended loss" for which the defendant is accountable. *See* U.S.S.G. § 2B1.1, comment. (n.3(A)(i), (iv)). "Actual loss" is the pecuniary harm that the "defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id*. For loss amounts between $3.5 million and $9.5 million, 18 levels are added to a defendant's base guidelines range. *See* U.S.S.G. § 2B1.1(b)(1)(J).

"The Guidelines do not require a precise determination of loss." *United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011) (citing *United States v. Cabrera*, 172 F.3d 1287, 1292 (11th Cir. 1999)). Instead, "[a] sentencing court need only make a reasonable estimate of the loss, given the available information." *Id*. (quoting *United States v. Lee*, 427 F.3d 881, 893 (11th Cir. 2005)).

A defendant is accountable for all acts that she "committed, aided, abetted . . . or willfully caused." U.S.S.G. § 1B1.3(a)(1). In cases involving joint criminal activity, a defendant is also accountable for the conduct of others if that conduct was (1) "within the scope of the jointly undertaken criminal activity," (2) "in furtherance of that criminal activity," and (3) "reasonably foreseeable in connection with that

criminal activity." *Id.* In calculating the amount of loss attributable to a defendant, a district court may rely on "trial evidence, undisputed statements in the presentence report, or evidence presented at the sentencing hearing." *Pierre*, 825 F.3d at 1197 (citation omitted). "Once a district court makes 'individualized findings concerning the scope of criminal activity undertaken by a particular participant,' it can determine foreseeability." *Id.* at 1198 (quoting *Hunter*, 323 F.3d at 1319).

We agree with the government that sufficient evidence supported the district court's finding that Ms. Alexander was accountable for a loss amount of $3.6 million. In addition to the evidence presented at trial, at Ms. Alexander's sentencing hearing an IRS agent testified that her review of the records showed that the co-conspirators had fraudulently obtained more than $4.7 million in proceeds. Because the evidence presented at trial and during the sentencing hearing showed that Ms. Alexander was fully involved in the conspiracy's day-to-day operations and contributed in multiple ways, the district court reasonably found that she was accountable for the full loss amount of $3.6 million. And even if the district court did not make sufficiently individualized findings about Ms. Alexander, the record supports its ultimate loss calculation and attribution. *See Pierre*, 825 F.3d at 1197.

## V

The Sentencing Guidelines provide for a two-level enhancement "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable

13

victim." U.S.S.G. § 3A1.1(b)(1). Ms. Alexander challenges the district court's imposition of this enhancement. She contends that the government did not present—and the district court did not rely on—any evidence that she knew or should have known that the victims of the sweepstakes scheme were particularly vulnerable.

The government responds that the evidence at trial showed that because Ms. Alexander served multiple roles in the conspiracy, and because her boyfriend was a co-conspirator who was actively involved with the scheme, she either knew or should have known how the scheme operated and that vulnerable victims were being targeted. The district court agreed and found that Ms. Alexander knew the victims were vulnerable because of her involvement in the day-to-day operation of the conspiracy.

"We review *de novo* the district court's application of the vulnerable victim enhancement[.]" *United States v. Birge*, 830 F.3d 1229, 1231 (11th Cir. 2016) (quoting *United States v. Kapordelis*, 569 F.3d 1291, 1315–16 (11th Cir. 2009)). The government must establish facts supporting the vulnerable victim enhancement by a preponderance of the evidence. *See United States v. Cooper*, 926 F.3d 718, 740 (11th Cir. 2019).

Based on Ms. Alexander's critical and extensive involvement in the sweepstakes scheme, as detailed earlier, the district court reasonably found that she knew or should have known that the victims of the scheme were vulnerable.

Therefore, the district court did not err by applying the vulnerable victim enhancement. *See Birge*, 830 F.3d at 1233–34 ("Because [the defendant] knew or should have known that the victims of her scheme were vulnerable, the district court did not err in applying the vulnerable victim enhancement.").

## VI

We affirm the convictions of Ms. Alexander and Mr. Hassan and the sentence of Ms. Alexander.

**AFFIRMED.**