[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-15541

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 2, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-00030-CR-T-27-MAP

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                        versus

LUIS ALBERTO RIASCOS VALENCIA,
CARLOS MARTINEZ LEDESMA,
JOHN CAICEDO VALLECILLA,
JUAN CARLOS HOYOS,  a.k.a. Juan Jaramillo Moyos, etc.,
CELSO MARINO NUNEZ MOSQUERA,
JULIAN CASTRO PORTOCARRERO,

                                        Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

**(March 2, 2006)**

Before TJOFLAT and KRAVITCH, Circuit Judges and LIMBAUGH*, District
Judge.

_____

*Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of
Missouri, sitting by designation.

LIMBAUGH, District Judge:

A federal grand jury in the Middle District of Florida indicted Julian Castro Portocarrero ("Portocarrero"), Carlos Martinez Ledesma ("Ledesma"), Luis Alberto Riascos Valencia ("Valencia"), John Caicedo Vallecilla ("Vallecilla"), Juan Carlos Jaramillo Hoyos ("Hoyos"), and Celso Marino Nunez Mosquera ("Mosquera") claiming that while onboard a vessel subject to the jurisdiction of the United States they conspired with each other and other persons to possess five kilograms or more of cocaine with the intent to distribute it, in violation of 46 U.S.C. app. § 1903(a), (g), and (j) and 21 U.S.C. § 960(b)(1)(B)(ii) (Count One) and that while onboard a vessel subject to the jurisdiction of the United States they possessed five kilograms or more of cocaine with the intent to distribute it, in violation of 46 U.S.C. app. § 1903(a) and (g) (18 U.S.C. § 2); 21 U.S.C. § 960(b)(1)(B)(ii) (Count Two).

The six defendants proceeded to trial, at which the jury found them all guilty of both charged offenses. Thereafter, the district court sentenced Portocarrero, Ledesma, Valencia, Vallecilla, and Mosquera to serve 235 months imprisonment and sentenced Hoyos to serve 292 months imprisonment. This appeal followed.

**I. Facts**

On January 22, 2003, a United States Navy team in a P-3 surveillance aircraft observed two fishing vessels in a "very high drug trafficking route" in the Pacific Ocean north of Ecuador. These vessels carried multiple fuel bladders, which are used to refuel "go-fast" boats that transport narcotics from Colombia to Central America.

Later that morning, also in the drug trafficking route, the Navy team observed a go-fast boat that had four 200-horsepower engines and was painted to match the color of the sea. The go-fast boat was unmarked, had no flag, and had no registration numbers, contrary to international law. Although that type of go-fast boat typically has a fuel range of only about 400 miles, the go-fast boat was 700 miles from land.

The go-fast boat, which had been moving quickly, went dead in the water as the P-3 plane approached. The plane passed over the go-fast boat and proceeded about two miles in order to turn around to make another pass. The plane takes about five minutes to make a full turn and return its sights to its target. As the plane returned and passed by the boat again, the plane's crewmembers could see people in the boat for only about thirty seconds.

After the plane's second pass, the boat started up again and took off,

traveling very fast at about 35 knots and making erratic, evasive turns. The boat's occupants did not look up as the plane passed overhead. The boat was riding low in the water, as though it was heavy.

The plane continued to pass over the boat, and some of the plane's crewmembers saw bales in the boat's wake, about 50 to 150 yards behind the boat. No member of the crew saw any bale being jettisoned from the boat. The plane's crew dropped a marker buoy in the debris field of the bales. The crew had seen no other boats out on the sea that day (other than the refueling vessels, which were about one-hundred miles away). Furthermore, there was negligible drift in the ocean that day.

The Seneca, a United States Coast Guard cutter, was about ten miles away from the go-fast boat, and on notification from the P-3 crew launched a helicopter to pursue and consider stopping the boat. The helicopter approached the boat and signaled for it to stop, but the men on the boat merely looked up at the helicopter and continued to speed across the water. The helicopter eventually fired warning shots in front of the boat, after which the boat slowed down but did not stop. Then, the helicopter shot at the boat's engines, and the boat finally stopped.

The Seneca also launched a small boat to pursue the go-fast boat. While in pursuit of the go-fast boat, the Coast Guard boat passed at least thirty or forty

bales floating in the water.  The bales, which were later observed not to be very waterlogged rode high in the water and it appeared that they had just recently been in the water.

When the Coast Guard boat eventually caught up to the go-fast boat, Coastguardsmen boarded and searched the go-fast boat.  The go-fast boat had fuel bladders under its deck that contained about 400 gallons of fuel.  While on the boat, the Coastguardsmen found three spare radios, including one that is used only for short-distance communications, a global positioning system ("GPS") device, and two spare engines.  Someone had pre-programmed into the GPS various "way points" in the ocean at intervals from 250 to 350 nautical miles.  The GPS provided directions to each of these inputted way points.  The data in the GPS showed that from January 19 to January 22, 2003, the GPS had traveled along the course of those input way points.  The course began in Colombia, but it did not include Ecuador.

Coastguardsmen conducted ion scans of the boat for cocaine residue, but the scans were negative.  There was testimony that ion scans frequently test negative because drug smugglers use masking agents.

No one on the boat claimed to be the captain.[1]  The men onboard claimed to

---

[1] In post-arrest interviews, defendant Hoyos admitted he was the captain.

5

have found the boat in Ecuador, although they all were Colombian, and they stated that they had taken turns driving it. They claimed that they were looking for a friend who was in the water.

Ultimately, 91 identically wrapped and marked bales of cocaine were recovered at different points in the water where the boat had passed, but about 10 nautical miles from where the boat was stopped. Some clusters of bales were one-half nautical mile from other clusters. The storage area under the go-fast boat's deck was large enough to hold the ninety-one bales of cocaine. The cocaine weighed a total of 1,816 kilograms.

The six defendants, who were on board the go-fast boat, were taken into custody and flown to the United States. They were not questioned on the flight, nor were they yet advised of their <u>Miranda</u> rights.[2]

Once the defendants arrived in the United States, they were advised of their <u>Miranda</u> rights and interviewed. The defendants all stated that a man named "Chucho" had recruited them to help rescue a disabled fishing boat. For the two-day mission, they were to be paid from 600,000 to 1,000,000 pesos, which is approximately a two month salary in Colombia. There was testimony that some drug couriers are paid much more for their services.

---

[2] <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

At trial, Mosquera's counsel asked DEA Special Agent Lincoln Benedicto, on cross-examination, whether, while onboard the plane flight to the United States, there was conversation about the one bale that was on the plane.[3] Agent Benedicto responded that Mosquera had asked him what was in the bale and had acted surprised when he had told Mosquera that the bale contained drugs. Mosquera denied that any bales of cocaine had been on the defendants' boat. On redirect examination, Agent Benedicto explained that all of the defendants had been on that small plane, along with agents, suitcases, the one bale, and "items of non-drug evidence." The prosecutor then asked, "Did any of the other detainees ask about any of that other evidence?" Agent Benedicto responded, "No, they did not. And all of this stuff was--it was in the passenger compartment of the plane. There was not a separate cargo area. It was in the passenger compartment. So everything was pretty much visible there." The defendants moved for a mistrial, arguing that the prosecutor had impermissibly commented on their silence. After a hearing, the district court concluded that United States v. Rivera, 944 F.2d 1563, 1568 (11th Cir. 1991) controls and says expressly that the Government may comment on a defendant's silence if it occurs before he is given Miranda warnings. Accordingly,

---

[3] Apparently one of the rescued bales of cocaine was loaded in the plane transporting defendants to the United States.

the district court denied the motion for mistrial.

## II. Discussion

*A.      46 U.S.C. § 1903 does not Violate the Sixth Amendment to the United States Constitution (Ledesma Issue I)*

Defendants[4] argue that § 1903 violates the Sixth Amendment to the U.S. Constitution because (1) Congress has not required that statute's penalty provisions, set forth in 21 U.S.C. § 960(b), be alleged in the indictment or proven to a jury, and (2) the issue of whether a vessel is subject to the jurisdiction of the United States was an essential element of the substantive offense and thus must be determined by a jury "beyond a reasonable doubt."  As such, the defendants argue that 46 U.S.C. § 1903 is unconstitutional because it violates Apprendi v. New Jersey, and perhaps, United States v. Gaudin[5].  The government's position is that this Court has previously rejected both of these arguments in two decisions, and the defendants reply that this Court should revisit its prior rejections of these

---

[4] Each defendant adopts the arguments set forth in one another's appellate briefs, to the extent that they are beneficial to that defendant; therefore, each argument is addressed as if each defendant raised it, unless otherwise specified.  (Hoyos Brief at ii; Ledesma Brief at viii; Mosquera Brief at vii; Portocarrero Brief at x; Valencia Brief at vi; Vallecilla Brief at vi).  Even though all defendants have adopted the issue as to whether § 1903 violates the Sixth Amendment, only Ledesma has briefed this issue.

[5] Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000); United States v. Gaudin, 515 U.S. 506, 115 S.Ct. 2310 (1995).

arguments in light of the Supreme Court's recent decision in <u>Blakely</u>.[6]

The constitutionality of a statute presents a legal issue reviewable *de novo*. <u>U.S. v. Tinoco</u>, 304 F.3d 1088, 1099 (11th Cir. 2002),<u>cert</u> <u>denied</u>, 538 U.S. 909 (2003); <u>United States v. Cunningham</u>, 161 F.3d 1343, 1345 (11 Cir. 1998).

46 App. U.S.C. § 1903(a) provides, "[i]t is unlawful for any person ... on board a vessel subject to the jurisdiction of the United States ... to knowingly or intentionally manufacture or distribute, or to possess with the intent to manufacture or distribute, a controlled substance." Section 1903(f) provides, "[a]ll jurisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge". The penalty for a violation of § 1903(a) involving five kilograms or more of cocaine is a term of imprisonment of not less than 10 years and not more than life. 46 App. U.S.C. § 1903(g); 21 U.S.C. § 960(b)(1)(B).

This Court has already determined that defendants' statute of conviction is not unconstitutional. <u>See</u> <u>United States v. Tinoco</u>, 304 F.3d at 1096-1102, in which the Court has resolved the issues raised by defendants. <u>See</u> <u>also</u> <u>U.S. v. Rendon</u>, 354 F.3d 1320, 1326-1328 (11th Cir. 2003), <u>cert</u>. <u>denied</u>, 124 S.Ct. 2110 (2004). In <u>Tinoco</u>, this Court held that § 1903 is not facially invalid under the Sixth

---

[6] <u>Blakely v. Washington</u>, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed 2d 403 (2004).

Amendment because that statute does not require that the penalty provisions thereof be alleged in the indictment or proven to a jury. Unless "the sentencing judge's factual finding [as to drug quantities] actually increased the defendant's sentence above the statutory maximum found in [21 U.S.C.] § 960(b)(3)," id. at 1101, there is no constitutional error. The sentence of each defendant here was not above the statutory maximum.[7]

In addition, we determined that the § 1903 requirement that a vessel be subject to the jurisdiction of the United States was not an essential element of the substantive offense and, thus, did not have to be submitted to a jury for proof beyond a reasonable doubt. U.S. v. Tinoco, 304 F.3d at 1112.[8]

B.      *Motions to Suppress Evidence (Mosquera's Issue II,
        Vallecilla's Issue III)*

Mosquera and Vallecilla argue that the district court erred in denying their motions to suppress the evidence that was found in the go-fast boat. The Government argues that neither Mosquera or Vallecilla, nor any other Defendant, filed a motion to suppress evidence in this case. The District Court noted, "there's

---

[7] Further, as set out in later discussions, drug quantities found by the district court were not objected to and thus, admitted by all defendants.

[8] Ledesma recognizes that Tinoco is controlling but suggests we reconsider the ruling in that case in light of Blakely v. Washington, supra. There is nothing in Blakely or, for that matter, in U.S. v. Booker, 543 U.S. ___, 125 S.Ct. 735, 160 L.Ed.2d 621 (2005) that would require a re-examination of our holding in Tinoco.

no motion to suppress that has been filed." As the Defendants did not move to suppress the evidence against them, they have waived that issue and may not raise it on appeal absent good cause shown. United States v. Ford, 34 F.3d 992, 994 n.2 (11th Cir. 1994).

C.    *The District Court did not Err in Denying the Defendants'*
      *Motions for Judgments of Acquittal because the Evidence was*
      *Sufficient for a Reasonable Juror to find Defendants Guilty of*
      *the Charged Offenses (Valencia's Issue I, Ledesma's Issue III,*
      *Mosquera's Issue I,Vallecilla's Issue II, Hoyos' Issue III,*
      *Portocarrero's Issue I)*

The Defendants challenge the sufficiency of the evidence of their guilt, arguing that the U.S. did not prove that they had possessed cocaine on board their go-fast boat with intent to distribute or that there was a conspiracy to do so. The Government argues that the evidence was adequate for a reasonable juror to find the Defendants guilty of the charged crimes beyond a reasonable doubt.

The sufficiency of the evidence against defendants is reviewed *de novo*. U.S. v. Jernigan, 341 F.3d 1273, 1278 (11th Cir. 2003).

> ". . . [I]n making this determination we 'view the evidence " in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor'"(citations omitted). "In the end, '[a] jury's verdict will be affirmed "if a reasonable trier of fact could conclude that the evidence establishes guilt beyond a reasonable doubt.'"(citations omitted). "Moreover, as we have explained, we also 'review *de novo* the district court's denial of a motion for judgment of acquittal, applying the same standard used in reviewing the sufficiency of

11

the evidence, meaning that we view the facts and draw all inferences in the light most favorable to the government.'" (citations omitted). Id.

"The standard to be applied in judging the sufficiency of the evidence is the same whether the evidence is direct or circumstantial." U.S. v. Peddle, 821 F.2d 1521, 1525 (11th Cir. 1987). (Defendants found guilty of conspiracy to possess with intent to distribute cocaine solely on circumstantial evidence. There was no direct evidence that defendants were aware of the cocaine.) See also U.S. v. Tinoco, 304 F.3d at 1122.

As to the conspiracy, Count 1 of the indictment, the Government must prove beyond a reasonable doubt that a conspiracy existed, the purpose of which was to possess with intent to distribute cocaine, that defendants knew of it, and that they voluntarily joined in it. United States v. Hernandez, 896 F.2d 513, 518 (11th Cir. 1990). Obviously, as to Count 2, the Government must prove defendants possessed cocaine with intent to distribute beyond a reasonable doubt as well. See also U.S. v. Tinoco, 304 F.3d at 1121-1124.

In conspiracy and possession cases involving narcotics-laden vessels, we have held that certain factors should be considered in determining whether a jury could reasonably conclude that a defendant, found on the vessel, was guilty of the drug conspiracy and possession charges such as: "(1) probable length of the voyage, (2) the size of the contraband shipment, (3) the necessarily close relationship between captain

12

and crew, (4) the obviousness of the contraband, and (5) other factors, such as suspicious behavior or diversionary maneuvers before apprehension, attempts to flee, inculpatory statements made after apprehension, witnessed participation of the crew, and the absence of supplies or equipment necessary to the vessel's intended use." Id. at 1123.

> "We also have stated that once a large quantity of contraband is shown to have been present on a vessel, the government's remaining burden of showing that the crew knowingly participated in the drug smuggling operation is 'relatively light.' Cruz-Valdez, 773 F.2d at 1547. Indeed the government can meet its remaining burden by proving any one of the other previously listed factors. United States v. Ospina, 823 F.2d 429, 433 (11th Cir. 1987) (per curiam)." Id. 1123.

Here the Government established that the crew of a U.S. Navy P-3 surveillance aircraft observed a go-fast boat in the Pacific Ocean north of Ecuador. The boat was 700 miles from land and was in a "very high drug-trafficking route." Earlier in the day, the P-3 crew observed two fishing vessels in the same drug trafficking route and these carried multiple fuel bladders which are used to refuel go-fast boats. The go-fast boat had been moving quickly and stopped as the P-3 plane approached it. The plane made several passes during which the boat began to move quickly again. Thereafter, the boat began making erratic and evasive turns. During the observance, no occupant of the boat looked up at the plane as it passed overhead. The boat was riding low in the water and traveling perhaps 35 knots. No member of the crew saw any bale being

13

jettisoned from the boat, however, during one of the passes one or more crew-members saw bales in the boat's wake and a marker buoy was dropped in the debris field of bales. The crew saw no other boat on the sea on that occasion other than the refueling vessels which were perhaps 100 miles away.

On notification to the *Seneca*, a United States Coast Guard cutter which was about 10 miles from the go-fast boat, the crew of the *Seneca* launched a helicopter to pursue the go-fast boat. A signal was sent from the helicopter for the go-fast boat to stop, but it continued at a quick speed through the water. Warning shots were fired in front of the boat following which it slowed, but it did not stop until the helicopter shot at the boat's engines.

In addition to the helicopter, the *Seneca* also launched a small boat to pursue the go-fast boat. During the pursuit, the crew of that boat passed at least 30 or 40 bales riding high in the water and it appeared they had just recently been in the water. Upon retrieval, they were found not to be waterlogged.

Ultimately, the crew of the Coast Guard boat caught up with it and boarded and searched the go-fast boat. The six defendants were all on board the boat, but there was no evidence of cocaine found and after ion scans of the boat were made for cocaine residue, all were negative. There was testimony that ion scans frequently test negative because drug smugglers used masking agents.

14

In the search of the go-fast boat the Coast Guard crew found three spare radios, a GPS and two spare engines. The GPS had been pre-programmed to set out "way points" at intervals in the ocean from 250 to 350 nautical miles. The GPS provided directions to each of these inputted way points. The course began in Columbia but did not include Ecuador.

The Coast Guard ultimately retrieved 91 identically wrapped and marked bales of cocaine in the area where the buoy had been dropped. It was an area where the boat had passed but was 10 nautical miles from where the boat was stopped. There were clusters of bales one-half nautical mile from other clusters. The cocaine weighed a total of 1,816 kilograms and there was evidence that the storage area under the go-fast boat's deck was large enough to hold the 91 bales.

At post-arrest interviews, all defendants stated that a man named "Chucho" had recruited them to help rescue a disabled fishing boat. For this service, each was to be paid from $600,000 to $1,000,000 pesos.

Defendants all contend that there is no evidence to prove that they had actual or constructive possession of the cocaine and that the ion testing for presence of cocaine on the go-fast boat was negative.

The jury was entitled to infer possession from the evidence. Although no member of the plane crew saw bales being jettisoned from the go-fast boat, some

members saw bales in the wake of the boat and there were no bales ever seen in front of the boat. The bales that were retrieved were in the general path the boat had taken before it was stopped. Other than the two refueling boats seen earlier in the day, there were no other boats in the area. One of the crew of the plane testified that when the go-fast boat was first observed, it was riding low in the water indicating a substantial cargo on board. The bales, when retrieved, were not waterlogged which suggested they had not been in the water for a long period of time; thus, the jury had a reasonable basis for concluding that the bales of cocaine had been on board the go-fast vessel and at some point were jettisoned by one or more of the defendants. The jury could also have found that although the ion test made of the boats for cocaine were negative, masking agents are frequently used.

Much of the criteria in Tinoco has been proved by the Government. The weight of the bales of cocaine was almost two tons. There appeared to be a relatively close relationship among the members of the crew and Hoyos who admitted he was the captain. The quantity of the cocaine on board the go-fast vessel had to have been obvious. The erratic maneuvers of the boat on being spotted, the appearance of the boat as unmarked, flagless and with no registration numbers and the attempt to evade the Coast Guard is not indicative of a legitimate purpose. On the basis of the evidence presented, it was reasonable for the jury to conclude that all defendants agreed to enter

16

into the drug smuggling conspiracy, and that they knowingly and voluntarily participated in it. Without question, the large quantity of cocaine involved created an inference that the defendants acted with the intent to distribute it. U.S. v. Tinoco, 304 F.3d at 1124. Certainly the circumstances that were sufficient to support the defendant's conspiracy conviction also supports their conviction on the possession count. Id.

We determine, therefore, that the district court did not err in denying the defendants' motions for judgment of acquittal because the evidence was sufficient for a reasonable juror to find each defendant guilty of the charged offenses. [See also U.S. v. Cardales, 168 F.3d 548 (1st Cir. 1999), aff. guilty verdicts of crewmen of go-fast boat where boat had fled from Navy ship and aircraft, and bales of drugs later were found floating in the vicinity.]

D.    *The Issue of Commenting on the Silence of a Defendant After He Has Been Given Miranda Warnings (Valencia's Issue II, Ledesma's Issue IV, Vallecilla's Issue II, Hoyos' Issue II and Portocarrero's Issue II)*

Defendants (with the exception of Mosquera) argue that the District Court abused its discretion in declining to grant them a mistrial following DEA Special Agent Benedicto's testimony on redirect examination that, other than Mosquera, none of the defendants had asked about the evidence stowed on the plane as they flew to the United States. The agent testified on cross-examination that Mosquera had pointed

17

out the bale of cocaine on board the plane and asked the agent why it was on the plane since it had not been on the boat. The defendants argue that this was a comment on the silence of all defendants except Mosquera, in violation of Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240 (1976), which held that the government may not use or comment on the silence of a defendant after he has been given Miranda warnings.

We review for abuse of discretion. U.S. v. Granville, 716 F.2d 819, 821 (11th Cir. 1983) (a trial court's ruling as to the scope of cross-examination by a prosecutor is reversible on appeal only for an abuse of discretion). The difference in this case is that defendants had not been given Miranda warnings, so the agent's testimony was not a comment on or use of the defendants' post-Miranda silence. U.S. v. Rivera, supra. (The Government may comment on a defendant's silence if it occurred prior to the time she/he was arrested and given Miranda warnings)[9] See also U.S. v. Campbell, 223 F.3d 1286, 1290 (11th Cir. 2000).

The Government also argues that the defendants' silence was not used "against them," but rather Mosquera's non-silence in asking about the bale may have tended to incriminate him because he was making an issue of the bale of cocaine, while the other defendants were not incriminated by not commenting on it. The silent

---

[9] Portocarrero in his brief admits that Rivera is controlling in this issue, and he is only raising the point "to preserve it for en banc or certiorari review" as he feels Rivera was wrongly decided.

18

defendants have not explained how this evidence on their silence was used "against them." This issue should be affirmed; it certainly does not fit into any post-Miranda case law holdings (like Doyle).

E.    *The District Court did not Commit Clear Error in its Findings in Regard to the Roles of Each Defendant (Valencia's Issue III, Ledesma's Issue II, Mosquera's Issue III, Vallecilla's Issue IV, Portocarrero's Issue IV)*

All defendants, except Hoyos, argue that the district court clearly erred in finding that they did not have minor roles in the charged offenses. The defendants that raise this issue maintain they were entitled to a two-point downward adjustment for their minor role in the offenses under § 3B1.2 of the United States Sentencing Guidelines (USSG). Alternatively, whatever role that each complaining defendant may have had, in the conspiracy was such that it deserved consideration for a downward departure under § 5K2 of the Guidelines.

The Court reviews the district court's findings as to a defendant's role in an offense for clear error. U.S. v. Rodriguez DeVaron, 175 F.3d 930, 937 (11th Cir. 1999), cert denied, Rodriguez DeVaron v. U.S., 528 U.S. 976 (1999).

In calculating a total offense level, USSG §3B1.2 provides an adjustment that if a defendant was a minor participant in any criminal activity, the offense level should be decreased by two levels. USSG § 5K2 authorizes departures, based on circumstances

19

of a kind not adequately taken into account in the Guidelines.

Defendants, referring to all defendants except Hoyos for the purpose of this assignment of error, aver that if, in fact, they were guilty of the charges, they were nothing more than couriers; as such, a courier plays only a minor role in the offenses. Defendants assert further that under Rodriguez DeVaron they should be compared with other participants. For illustration, defendants suggest that the role of the originator of the drugs, the owner of the boat, the owner of the drugs and the recipient of the drugs should all be considered and their conduct compared with that of defendants, and in so doing, defendants' conduct was minor.

In denying defendants' request for downward adjustment as minor participants, the district court agreed that Rodriguez DeVaron was controlling.

Rodriguez DeVaron smuggled 70 heroin filled pellets into the United States from Columbia. On coming into the United States, she was arrested and confessed. After recovering the pellets, while Rodriguez DeVaron was in a hospital, the quantity measured 512.04 grams of 85% pure heroin. Rodriguez DeVaron admitted that a woman identified as "Nancy" provided her with travel advance money and promised that upon delivery of the drugs in Miami, she would receive $6,000. Rodriguez DeVaron entered a plea of guilty pursuant to plea bargaining and we determined that the district court did not commit clear error in denying defendant a downward adjustment

as a minor player in the offense.

In <u>Rodriguez DeVaron</u> we held that a defendant's status as a drug courier does not alter the principle that the district court must assess the defendant's role in light of the relevant conduct attributed to her, <u>Id.</u> 942. We stated that the amount of drugs imported is a material consideration in assessing a defendant's role in her relevant conduct, <u>id.</u> 943, and the district court may also measure the defendant's culpability in comparison to that of other participants in the relevant conduct, <u>Id.</u> 944. We also said,

> "In the drug courier context, examples of some relevant factual considerations include: amount of drugs, fair market value of drugs, amount of money to be paid to the courier, equity interest in the drugs, role in planning the criminal scheme, and role in the distribution. This is not an exhaustive list, nor does it suggest that any one factor is more important than another. In the final analysis, this decision falls within the sound discretion of the trial court." <u>Id.</u> 945.

Here, the jury found defendants guilty of a conspiracy to possess with the intent to distribute 5 kilograms, or more, of cocaine and possession with the intent to distribute that quantity of cocaine. Defendants were a part of a crew operating a go-fast boat containing almost two tons of cocaine. The go-fast boat had four 200 horsepower engines, was unmarked, had no flag and no registration numbers. Ordinarily, that type of boat has a fuel range of only 400 miles. However, the go-fast boat was 700 miles from land when intercepted. There were fuel bladders under the go-fast boat deck which contained 400 gallons of fuel. The go-fast boat was equipped with three spare

21

radios, including one that is used only for short distance communications and a GPS device and two spare engines. Defendants' participation as members of the crew of the go-fast boat was central to the conspiracy scheme. The role that each defendant played as members of the crew constituted an integral and essential part in the scheme to possess with intent to distribute cocaine.

The role of defendants here was even more vital to the success of the scheme than it was in Rodriguez DeVaron. There, the defendant was simply carrying an illegal drug from one country to another via commercial aircraft. Here, defendants' actions as members of a boat crew transporting cocaine were essential to the success of the journey which, under all of the facts here, was a hazardous one and one which needed the combined efforts of all defendants to be successful. This is a proper measurement of the role of defendants in assessing their relevant conduct. Their participation and implementation of the scheme was central to its success.

To be sure, the quantity of the cocaine, about two tons, was a material consideration in assessing the role of each defendant here and their relevant conduct which was alluded to by the district court in the sentencing process.

Finally, defendants have not met their burden of proof that their participation in

the scheme involved a minor role only.[10] Defendants elected not to testify at trial, which obviously was their right, nor did they testify at the sentencing hearing. The district court, in ruling on the request for a downward departure, was limited to the evidence presented during the course of the trial. There was no evidence as to the originators, or the owners or recipients of the cocaine. There was no evidence as to what contact, if any, the defendants had with the supplier. There was no evidence that the defendants themselves could have owned the cocaine and were transporting it solely for their own benefit. In fact, the record is devoid of any facts, other than speculation, suggesting other parties are discernable or identifiable. Other than Hoyos, there is nothing to show that any defendant had any different duty or responsibility than the other or was less or more culpable than the other.

Defendants argue that the small sum of money to be paid a defendant obviates the participation of others and that it is insignificant when compared to the value of the cocaine which was perhaps as much as $30,000,000 on the drug market. This argument is somewhat incongruous as it admits the guilt of each defendant, whereas defendants at their post-arrest briefing stated that the money to be paid to them was to help rescue a disabled fishing boat.

---

[10] The burden of establishing a minor role in the offense rests with the proponents. U.S. v. Rodriguez DeVaron, 175 F.3d at 946.

23

In the later context, the amount is not significant. In any event, the pay of 600,000 to 1,000,000 pesos or perhaps $500 per member of the crew was somewhat insignificant as compared to the value of the cargo. This is a factor to be considered but is not dispositive and is far outweighed by the other evidence in this case showing that defendants have not met their burden in proving that they were entitled to a two-level reduction as a minor player in the scheme.

The district court also concluded that if a defendant has not qualified for a downward adjustment as a minor player in the conspiracy, he is unable to qualify for a § 5K2 downward adjustment. This finding of the district court is not clearly erroneous.

F.      *The Blakely and Booker Issues (Portocarrero's Issue III, Hoyos Issue I)*

All defendants contend that the factual determination of the district court that the crime involved a quantity of cocaine resulting in a base offense level of 38 and the same total offense level for all except Hoyos, whose level was 40, was not charged in the indictment nor was it submitted to a jury, all in violation of the Fifth and Sixth Amendments to the Constitution[11] and inapposite to the Apprendi, Blakely and Booker holdings.[12] Hoyos also contends that the two-level sentencing enhancement he received

---

[11] Only Portocarrero and Hoyos made specific Apprendi, Blakely and Booker objections to the findings of the district court, however, each defendant asked, and was granted leave, to adopt the objections of the other defendants.

[12] Apprendi v. New Jersey, supra; Blakely v. Washington, supra, U.S. v. Booker, supra.

24

under § 2D1.1(b)(2) violated the Sixth Amendment because this issue was not submitted to a jury.

No defendant objected in the district court that his sentence was unconstitutional in view of Blakely because it was based upon a finding of drug quantity by the district court as opposed to a jury finding. In addition, while Hoyos objected at sentencing that it was inappropriate for the district court to enhance his sentence under §2D1.1(b)(2) there was no objection until this appeal that the enhancement was unconstitutional in view of Blakely. Therefore, our standard of review is for plain error only. U.S. v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir., 2005), cert denied Rodriguez v. U.S., 125 S.Ct. 2935 (2005).[13]

The standard for a plain error review is that an appellate court may not correct an error a defendant failed to raise in the district court unless there is 1) error; 2) that is plain, 3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if 4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings, U.S. v. Rodriguez, 398 F.3d at 1298.

All defendants were found guilty of conspiring to possess, with intent to distribute, five kilograms or more of cocaine. Following the drug quantity table in

---

[13] See also U.S. v. Rodriguez, 406 F.3d 1261 (11th Cir.) (den. req. for reh'g. en banc).

(USSG) § 2D1.1(c)(4) a base offense level of 32 would be established as found by the jury, and thus not unconstitutional.

The presentence investigation report (PSI) set out facts based on the evidence at trial that after combing the area involved, officers recovered a total of 91 bales containing approximately 1,816 kilograms of cocaine. Pursuant to the drug quantity table, this would correspond to a base offense level of 38. The district court accepted the report setting out this evidence and assessed a base offense level of 38 as to all defendants.

In the consideration of the plain error review of this objection, as set out in Rodriguez, supra, the first prong of the test is not satisfied. There was no error. At sentencing, no defendant raised any objection to the finding that each was accountable for 1,816 kilograms of cocaine which corresponded to a base offense level of 38. Counsel for all defendants urged the Court to depart downward under (USSG) § 3B1.2 or § 5K2 asserting defendants were minor players in the conspiracy, and some defendants suggested they were less involved than other defendants, but all stated they had no other objections to the PSI. No defendant objected to the quantity of cocaine or that it was equivalent to a base offense level of 38.[14] Accordingly, all facts set out in the

---

[14] In fact, defendants used the 1,816 kilograms of cocaine in their argument for a downward departure as minor participants suggesting the disparity between what they were to be paid as against the huge value of the drugs as discussed earlier.

PSI of each defendant are admitted as true. U.S. v. Shelton, 400 F.3d 1325, 1329, 1330 (11th Cir. 2005). As defendants admitted the facts forming the basis for establishing a base offense level of 38, there is no Sixth Amendment violation under Booker. Id.

The same reasoning applies to Hoyos' separate objection. Using § 2D1.1(b)(2) the district court added two levels to the base offense level of 38, making Hoyos' total offense level 40.

(USSG) § 2D1.1(b)(2) provides that:

"If the defendant unlawfully imported or exported a controlled substance under circumstances in which . . . [B. the defendant acted as a pilot, co-pilot, captain, navigator, flight officer or any other operation officer aboard any craft or vessel carrying a controlled substance, increase by two levels."

Hoyos asserts, on appeal, that the facts supporting this two-level adjustment were not charged in the indictment nor were they submitted to a jury, all in violation of Apprendi, Blakely and Booker. Here, too, we conclude that the first prong of the Rodriguez test, when considering plain error review, is not satisfied.

It was stated in the Hoyos' PSI "In post-arrest interviews, several of the crew members identified Juan Carlos Jaramillo Hoyos (Jaramillo-Hoyos) as the 'go-fast' vessel captain. Jaramillo-Hoyos confirmed that he was the captain of the go-fast and he advised that he had been attending training in Buena Ventura, Colombia to earn his captain's license."

27

Counsel for Hoyos did not object to the accuracy of the PSI findings which the district court adopted, but urged that there be something more than the admission in order to apply the enhancement. We do not accept that argument.

The district court adopted the PSI statements which were not controverted and found that the two level enhancement should be applied because Hoyos admitted that he was the captain of the go-fast vessel and several crew members identified him as such. At sentencing, the district court stated, "The word captain is applied in a common sense manner." There is nothing in § 2D1.1(b)(2) to suggest otherwise. As the facts set out in Hoyos' PSI are admitted as true, they are sufficient to form the basis for establishing the enhancement. U.S. v. Burge, 407 F.3d 1183, 1191 (11th Cir. 2005) (a waiver of objections to factual statements about a defendant's relevant conduct in the presentence report is an admission of the facts in the report.) Therefore, there is no Sixth Amendment violation under Booker. U.S. v. Shelton, 400 F.3d at 1329 and 1330. U.S. v. Cartwright, 413 F.3d 1295, 1298 (11th Cir. 2005).

As the Court found in Burge, here too, there is no error under Booker. Hoyos has not carried his burden as to the third prong of the Rodriguez plain error test. Hoyos cannot show "there is a reasonable probability of a different result if the Guidelines had been applied in an advisory instead of binding fashion by the sentencing judge in this case." Burge, 407 F.3d at 1192 citing Rodriguez, 398 F.3d at 1301.

For the foregoing reasons, we affirm.

AFFIRMED.